UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and HOWARD McDOUGALL, trustee, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 04-58-DLB Judge David L. Bunning |
| ALVERA SIERMANN, | ) ) | |
| Defendant. | ) | ELECTRONICALLY FILED |

**CENTRAL STATES' COMBINED REPLY MEMORANDUM IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
ALVERA SIERMANN'S MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

Alvera Siermann ("Siermann") argues that because Siermann Hauling, Inc. ("Hauling") was not insolvent at the time of, nor was its insolvency caused by, the payments she received during 2001, the transfers to her were not fraudulent. Siermann also argues that Hauling did not intend to defraud its creditors and therefore, the transfers to her in 2001 were not fraudulent. As the following evidence will show, Hauling was insolvent or became insolvent as a result of the transfers to Siermann. Even if Hauling was solvent (which the evidence demonstrates it was not), Siermann was not entitled to any distribution of equity until such time as all of Hauling's creditors were paid. Moreover, the facts reveal that Hauling made the transfers to Siermann in an effort to prevent Central States from collecting the withdrawal liability Hauling incurred upon its cessation of

operations.

## II. ARGUMENT

### A. Hauling Was Insolvent During 2001.

Siermann relies on the deposition testimony of Allie Jackson ("Jackson"), the accountant for Hauling and Siermann, in support of her argument that Hauling was solvent during 2001. Jackson testified that in preparing his affidavit in support of Siermann's Motion to Dismiss he reviewed Hauling's financial statements for the period ending 2001, including checks that were written to Siermann. (Exhibit D to Central States' Statement of Undisputed Material Facts As To Which There Is No Genuine Issue, submitted in support of Central States' Motion for Summary Judgment at page 25 (hereinafter, "Ex. D, pg. ___")). As a result of this review, he executed an affidavit under penalty of perjury in which he stated that as of January 22, 2002, all of Hauling's creditors were paid. (Ex. D, pg. 25).[1] The following evidence reveals that Jackson's affidavit was false and that Hauling was in fact insolvent, or became insolvent, as a result of the transfers to Siermann.

The financial statements Jackson reviewed do not support Jackson's affidavit or his sworn deposition testimony. Hauling's financial statement as of September 30, 2001 (a true copy of which is attached hereto as Exhibit 1) reflects that Hauling had total assets in the amount of $274,487.37, while its liabilities totaled $285,522.08.

Hauling's financial statement as of December 31, 2001 (a true copy of which is attached hereto as Exhibit 2) reflects that Hauling's financial situation deteriorated in the intervening

---

[1] Jackson's affidavit should be given no weight in light of his admission during his deposition that he mis-characterized the nature of the payments Siermann received in 2001. (Ex. D, pg. 35 & 36). See *Peck v. Bridgeport Machines, Inc.*, 237 F.3d 614, 619 (6th Cir. 2001)(affidavit cannot create factual dispute where it contradicts deposition testimony).

three months.  Hauling's total assets ($160,800.64) were less than its total liabilities ($219,622.11).  Even if Hauling was successful in liquidating <u>all</u> of its assets at the end of 2001, the proceeds would have been insufficient to satisfy its outstanding liabilities.[2]  In fact, Jackson testified that to his knowledge, the $30,773.41 asset representing the "loans to officers" was never collected.  (Ex. D, pg. 45).  It should also be noted that the alleged "loan" repayments to Siermann are not reflected in Hauling's  September 2001 or December 2001 financial statements.  In fact, the balance for the liability "Loans Payable – Stanton & Siermann" remained at $19,000 in both documents even though payments on account of this alleged "loan" were supposedly made to Siermann between January and September 2001.  (Ex. C to Central States' Statement of Undisputed Material Facts As To Which There Is No Genuine Issue, submitted in support of Central States' Motion for Summary Judgment (hereinafter, "Ex. C")).

Furthermore, Robert Siermann, one of Hauling's corporate officers who was involved in Hauling's day to day business operations, testified that Hauling was "out of money" and that was one of the reasons Hauling shut down in July 2001.  (Exhibit F to Central States' Statement of Undisputed Material Facts As To Which There Is No Genuine Issue, submitted in support of Central States' Motion for Summary Judgment at page 13 (hereinafter, "Ex. F, pg. ___")).  Robert Siermann also testified that none of Hauling's unsecured creditors received any payment of debts that Hauling owed them after Hauling ceased operations and liquidated its assets.  (Ex. F, pg. 30).  Thus, it is clear that Hauling was insolvent at the time of, or as a result of, the transfers to Siermann.

### B. The Transfers to Siermann Were Improper Under Either Kentucky Or Ohio Corporate Law.

---

[2]   It is beyond cavil that a forced sale of Hauling's assets would not have yielded a 100% recovery.

Even if Hauling was solvent (which Central States contends it was not), the transfers to Siermann were improper because under either Kentucky or Ohio corporate law, shareholders are not entitled to <u>any</u> distribution of equity until such time as <u>all</u> creditors are paid.[3] *Leyman Corp. v. Piggly-Wiggly Corp.,* 90 Ohio App. 506, (1951); *Star Hardware & Supply Co. v. Toledo Steel Castings Co.*, 90 Ohio St. 171 (1914); *Hazelhurst Lumber Co. v. Carlisle Mfg. Co.*, 112 S.W. 934 (Ky. App. Ct. 1908); *Stephens Bldg. Credits, Inc.* 265 S.W. 2d 60 (Ky. App. Ct. 1954). A corporation's judgment creditors have the right to maintain a cause of action against the corporation's shareholders for the sums the shareholders received in unlawful distribution. *Chisnell v. Ozier Co.*, 140 Ohio St. 355, 363, 44 N.E.2d 464, 468 (1942). A judgment creditor may also pursue assets wrongly transferred to, and held by, a third party. *Condaire, Inc. v. Allied Piping, Inc.*, 286 F.3d 353 (6th Cir. 2002).

It is clear from Hauling's financial statements and the testimony of Robert Siermann that Hauling was in financial distress and as a result ceased operations in July 2001. (*See*, Ex. 1 and Ex. 2; Ex. F, pg. 13). As of September 30, 2001, Hauling owed over $285,000 to its creditors. Furthermore, as of December 31, 2001, Hauling still owed over $219,000 to creditors. Even if Hauling's assets were liquidated for 100% of their value, those assets were insufficient to satisfy all of Hauling's obligations by January 22, 2002. Moreover, because Hauling ceased operations in July 2001 (*see* Ex. F, pg. 13), it could not possibly have been generating income with which it could satisfy the shortfall in excess of $58,000 at the end of 2001. Therefore, Siermann was not entitled to any equity distributions.

---

[3] Siermann failed to address this basis for Central States' claim in her Motion for Summary Judgment or in Response to Central States' Motion for Summary Judgment, although Central States made this argument in Section B of its Memorandum in Support of its Motion. Therefore, Siermann has waived her right to challenge this basis for relief.

Therefore, Central States has the right to recover the transfers Siermann received in partial satisfaction of the withdrawal liability Hauling owes to Central States.

### C. Hauling Possessed The Requisite Fraudulent Intent.

The question of fraud necessarily involves the element of intent. *Spotts v. United States of America*, 335 F.Supp.2d 761, 767 (E.D. Ky. 2004). Intent must be determined by considering the circumstances surrounding the transfer since direct evidence is seldom present. *Id.* Fraudulent intent is determined by "badges of fraud", which include (but are not limited to) inadequacy of consideration, secret or hurried transactions outside the normal course of business, transfers in anticipation of suit, reservation of benefits by the transferor, and the transfer or conveyance between persons who are related or occupy a confidential relationship. *Id.; Bank of Josephine v. Hopson*, 516 S.W.2d 339, 341 (Ky. 1974); *Griggs v. Crane's Trustee*, 200 S.W. 317, 319 (Ky. 1918); *Allen v. Ligon*, 194 S.W. 1050, 1052 (Ky. 1917).

In the instant case, there are multiple badges of fraud. First, Hauling was insolvent, or at the very least, considerably indebted at the time Hauling made the transfers to Siermann. *Griggs*, 200 S.W. 317 ("It is a badge of fraud for an insolvent debtor, or one who is very considerably indebted, to make a transfer of his property."). Robert Siermann, an officer of Hauling involved in Hauling's day-to-day operations, testified that S & S Transfer loaned money to Hauling for operating expenses and payroll in and effort to keep Hauling "afloat". (Ex. F, pg. 34). Robert Siermann also testified that Hauling ceased operations in July 2001 because Hauling was "out of money". (Ex. F, pg. 13 ). Although Hauling was unable to meet its payroll and operating expenses without a substantial loan from a related entity, and finally closing its doors because it had "no money", Hauling made distributions of equity to not only Siermann, but all of Hauling's shareholders, during 2001 in the amount

of $24,873.30 (*See,* Ex. 1 and 2), and property distributions totaling $7,256.00. (Exhibit 22 to Ex. D).

Second, Hauling transferred equipment to S & S Transfer after Hauling ceased operations. (Ex. F, pg. 29). There is a close relationship between Hauling and S & S Transfer. Three of Hauling's shareholders (Robert Siermann, Edward Siermann and Roberta (Willis) Stanton) own all of S & S Transfer's stock. (Ex. F, pg. 37). Therefore, control over those assets, once transferred, did not change because Hauling's shareholders (Robert Siermann, Edward Siermann and Roberta (Willis) Stanton) continued to exercise control over those assets after they were transferred to S & S Transfer. More importantly, S & S Transfer used those assets to service Cincinnati Bulk Terminals, the only work performed by Hauling but transferred to S & S Transfer after Hauling shut down its operations at the end of July 2001. (Ex. F, pg. 11).

Third, the motions filed by Hauling itself in the instant litigation point to Hauling's fraudulent intent with respect to the transfers to Siermann. In its Motion to Dismiss for Failure to Join Necessary Parties, Hauling asserts that the monies paid to Siermann were "wages for services performed and for repayment of loans" that Siermann made to Hauling. (Docket Entry 7 at page 3; Docket Entry 12 at page 1). Hauling's assertion that a portion of the transfers were for wages rings false since Hauling's own records reflect that Siermann was never issued an Internal Revenue Service Form W-2 for the 2000 or 2001 tax year. (Exhibits 7 and 8 to Ex. D). Moreover, Robert Siermann admitted that Siermann received distributions of equity in 2001. (Ex. F, pg. 36).

Hauling's explanation for the transfers is also suspicious in light of the admission of Hauling's accountant that he mis-characterized those payments in the affidavit which Siermann submitted in support of her motion to dismiss. (Ex. D, pg. 40). Moreover,

Robert Siermann testified that Hauling gave a note to S & S Transfer, the proceeds of which were used to pay operating expenses and payroll to keep Hauling "afloat". (Ex. F, pg. 26, 34).

Finally, Hauling had notice of Central States' claim for withdrawal liability prior to January 2002. Hauling was subject to a collective bargaining agreement between itself and Local Union 100 for the period June 1, 1995 through May 31, 1999 (the "CBA"). (Affidavit of Gina Alvarez at paragraph 3 attached hereto as Exhibit 3 (hereinafter, "Ex. 3, ¶ __")). The terms of the CBA were subsequently extended to May 31, 2000, and May 31, 2001, respectively, when Hauling executed Extension Agreements. (Ex. 3, ¶ 4). In late June 2001, Local Union 100 requested from Central States an estimate with respect to Hauling's withdrawal liability. (Ex. 3, ¶ 5).

In early July 2001, Local 100 notified Central States that Hauling was not hiring any new employees and that all work was being transferred to S & S Transfer. (Ex. 3, ¶ 6). As a result of this information, Central States sent correspondence to Hauling (addressed to Robert Siermann), advising that Central States was informed that Hauling may have incurred a complete or partial withdrawal from Central States due to the termination of some, or all of Hauling's bargaining unit employees. (Ex. 3, ¶ 7). Enclosed with that correspondence was a Statement of Business Affairs ("SOBA") which Hauling was asked to complete and return. (*Id.*, ¶ 7). The SOBA requested certain information, including other businesses owned by Hauling's shareholders.[4] (Ex. 3, ¶ 7).

Repeated calls to Robert Siermann during the period October through December

---

[4] Pursuant to ERISA Section 4001(b), all trades or businesses (whether or not incorporated) which are under common control are treated as a single employer for the assessment and collection of withdrawal liability. *Teamsters Pension Trust Fund of Phila. and Vicinity v. Central Mich. Trucking, Inc.*, 857 F.2d 1107, 1109 (6th Cir. 1988).

2001 went unreturned until December 13. (*Id.*, ¶ 8). When asked on December 13 for the reason for Hauling's withdrawal, Robert Siermann explained that Hauling had lost its *accounts* with companies for which Hauling had previously performed hauling work. (*Id.*, ¶ 8).[5]

### III. CONCLUSION

Hauling was insolvent at the time of, or became insolvent as a result of, the transfers to Siermann. Although Hauling was forced to borrow money from a related entity to "stay afloat", Hauling managed to make distributions of equity and property to its shareholders during 2001 totaling $32,329.30, a portion of which was distributed after Hauling ceased operations but before Hauling had paid all of its creditors.

Even if Hauling was solvent when the transfers were made, the transfers were improper equity distributions to Siermann because, in fact, all of Hauling's creditors had not yet been paid. As a result, Central States is entitled to recover those transfers from Siermann in partial satisfaction of its withdrawal liability claim.

The facts and circumstances of this case are replete with the "badges of fraud" which clamor for an inference of fraudulent intent. The transfers were made at a time when Hauling's assets were insufficient to satisfy its obligations. The transfers were made while Hauling was borrowing money from S & S Transfer, an entity owned by three of Hauling's shareholders, to meet payroll and operating expenses. Moreover, immediately before Hauling ceased operations, it transferred work to S & S Transfer, and all of Hauling's transportation equipment was transferred to S & S Transfer after Hauling ceased

---

[5] Central States took the deposition of Robert Siermann on October 13, 2003, in an effort to collect the withdrawal liability judgment directly from Hauling. During that deposition, Mr. Siermann testified that Cincinnati Bulk Terminals had been Hauling's sole account immediately before Hauling ceased operations. (Ex. F, pg. 11).

operations.

Finally, there are Hauling's statements in pleadings it has filed in this case and the false affidavit of Jackson, Hauling's accountant, in which both falsely assert that the transfers were for wages and repayment of a loan made by Siermann to Hauling. The evidence establishes that Hauling never issued a W-2 to Siermann for 2000 or 2001 and that the transfers were equity and property distributions.

Finally, the evidence establishes that Hauling was aware of its withdrawal liability obligation to Central States. It failed to respond to Central States' written and telephonic requests for information concerning the withdrawal for months. Thus, summary judgment should be granted in favor of Central States and against Alvera Siermann.

Respectfully submitted,

/s/ David M. Cook

David M. Cook
Cook, Portune & Logothetis
22 West 9th Street
Cincinnati, OH 45202
Phone: (513) 721-7500
Fax:    (513) 721-1178
dcook@dmcllc.com

/s/ Cathy L. Rath

Cathy L. Rath
Central States, Southeast and Southwest
Areas Pension Fund
9377 West Higgins Road
Rosemont, IL 60018-4938
Phone: (847) 518-9800, ext. 2343
Fax:    (847) 518-9797
crath@centralstates.org

August 23, 2005                              Attorneys for Plaintiffs

### Certificate of Service

      I hereby certify than on August 23rd, 2005, I electronically filed the foregoing with the Clerk of Court by using the CM/EFC system, which will send a notice of electronic filing to the following:

> C. J. Schmidt
> Jeffrey P. McSherry
> Wood & Lamping, LLP
> 600 Vine Street
> 2500 Cincinnati Commerce Center
> Cincinnati, OH 45202-2409

 

> /s/ David M. Cook
> David M. Cook
> Cook, Portune & Logothetis
> 22 West 9th Street
> Cincinnati, OH 45202
> Phone: (513) 721-7500
> Fax:     (513) 721-1178
> dcook@dmcllc.com